AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| ISRAEL ALCANTARA BUJASE, | |
| Defendant(s) | |

**F I L E D**
CLERK, U.S. DISTRICT COURT

**10/09/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AF _____ DEPUTY

Case No.    2:24-mj-06195-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 20, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Possession with intent to distribute and distribution of fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Timothy Holden*
*Complainant's signature*

Timothy Holden, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 9, 2024

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA:    Sara Vargas

**AFFIDAVIT**

I, Timothy Holden, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against ISRAEL ALCANTARA BUJASE ("BUJASE") for committing a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute and Distribution of Fentanyl) on October 20, 2023.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All dates, times, and amounts are approximate.

## II. BACKGROUND OF TIMOTHY HOLDEN

3.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been a federal law enforcement officer since June 2020.  I am currently assigned to the Los Angeles Field Division, where I participate in investigations involving, among other federal offenses, prohibited persons possessing firearms, persons trafficking firearms and controlled substances, and persons possessing

illegal firearms.  I have also participated in investigations focusing on gang activity and transnational organizations.  I have participated in multiple ATF operations and assisted local police investigating violations of firearms and narcotics laws. I have also received both basic and specialized training about violations of federal firearm laws and the methods used to investigate those violations.

### III. SUMMARY OF PROBABLE CAUSE

4.    Between 2021 and 2023, BUJASE sold a firearm and tens of thousands of pills confirmed to contain fentanyl to an ATF confidential informant and undercover law enforcement officers. BUJASE has never had a federal firearms license permitting him to sell guns.

### IV. STATEMENT OF PROBABLE CAUSE

5.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    September 13, 2021: BUJASE Sells a Firearm to a Confidential Informant and Undercover Law Enforcement Officer**

6.    In September 2021, a confidential informant working at ATF's direction (the "CI") told ATF agents about a person who was offering guns for sale.[1]  Specifically, the CI said BUJASE was offering to sell two Glock pistols for $2,600, or one for

---

[1] The CI has a 2013 felony conviction for second-degree robbery under California Penal Code section 211, for which s/he was sentenced to a 3 years' probation.  The CI also sold numerous firearms without a federal firearms license and also distributed approximately 12 grams of heroin and has not yet been charged for that conduct.  The CI has been compensated approximately $15,065.43 in ATF funds to date.

$1,300.  I directed the CI to communicate with BUJASE to arrange for a controlled purchase of the guns BUJASE was selling. During the CI's communications with BUJASE, which took place by phone call and text message, BUJASE sent photographs of guns to the CI and agreed to sell them.

7.    On September 13, 2021, BUJASE and the CI further communicated about the guns BUJASE was offering for sale. BUJASE told the CI that he had one Glock firearm for sale.  At ATF's instruction, the CI agreed to make the purchase, and BUJASE and the CI arranged to meet that same day.  The CI said s/he would bring an associate, who was actually an undercover law enforcement officer ("UC-1").  BUJASE told the CI to meet in front of a residence in Bell Gardens, within the Central District of California, to do the transaction.

8.    On that date, at around 11:00 a.m., UC-1 and the CI went to the location BUJASE chose, and BUJASE walked toward the car that the CI and UC-1 were inside of.  At the time, BUJASE was carrying a bag.  BUJASE then handed UC-1 the bag through the window.  UC-1 then paid BUJASE $1,350 for the firearm.

9.    When UC-1 and the CI left the location of the gun deal, they looked in the bag and saw that BUJASE had sold them a 9mm Glock model 43 pistol bearing serial number ZGX638.  The firearm that BUJASE sold is depicted as follows:



10.  ATF maintains a database (called the Firearms Licensing System, or "FLS") of individuals who possess a federal firearms license ("FFL") and are, therefore, able to legally sell firearms.  Based on my review of FLS records, I know that BUJASE was not an FFL-holder at the time he sold the firearm to UC-1 and the CI, nor was he a pending FFL applicant or licensee.

**B.   October 16, 2023 through September 14, 2023: BUJASE Sells Tens of Thousands of Fentanyl Pills to a Confidential Informant and Two Undercover Law Enforcement Officers**

11. Based on my review of the CI's Instagram messages, I know that, at ATF's request, on October 16, 2023, the CI communicated with BUJASE via Instagram and asked BUJASE if BUJASE had any more guns for sale.

12. I believe the person the CI was communicating with via Instagram was, in fact, BUJASE, because the communications later led up to in-person transactions at which BUJASE was present. Additionally, BUJASE's Instagram name was "izzbujase," which I believe is a variation of BUJASE's name, and I know people frequently use their names or portions of their names as their Instagram handles.  Also, photographs in posts by the Instagram account also showed BUJASE's face.  I recognize BUJASE's face

from my review of his California Department of Motor Vehicles photograph and records, as well as from my presence on surveillance during the controlled purchases described in this Affidavit.

13. In addition, on or about December 18, 2023, I received subscriber information for the Instagram account "izzbujase" from Meta Platforms Inc. The subscriber information provided listed telephone number, 310-220-7156, as the only subscriber information provided to Meta Platforms Inc. BUJASE used that telephone number to communicate with the CI and a second uncover law enforcement officer ("UC-2") when arranging some of the drug transactions listed in this Affidavit. I also reviewed messages and other information that BUJASE's Instagram account contained, after serving a duly authorized federal search warrant, Case No. 2:24-MJ-01325. BUJASE's Instagram account contained messages and other evidence about his involvement in selling contraband.

a. For example, on or about October 20, 2023, at about 2:02 a.m., BUJASE sent a video to the CI depicting two bags of what appears to be fentanyl pills and the message, "Everything ready to go." Still shots of the videos appear as follows:



   b.    In another example of BUJASE's use of Instagram
to deal in contraband, on February 1, 2024, I viewed an
Instagram story that "izzbujase" posted.  The photograph
depicted what might be a coffee or pastry shop with the caption,
"G 43 New"[2] and "DM ME FOR SERIOUS INQUIRIE'S," and a squirt gun
emoji.

   14.  In response to the CI's October 16th message, BUJASE
wrote to the CI that he didn't have any guns for sale at that
time but did have "boats of blues" that he would sell for $550
per "boat."[3]  The CI told BUJASE that the CI could connect
BUJASE to an interested buyer.  The buyer was, in fact, UC-1,
and BUJASE arranged to meet with UC-1 on October 20, 2023,

_____

   [2] Based on my training and experience, I am aware that
"G 43" is street vernacular Glock 43 pistol.

   [3] In my training and experience, and from my involvement in
this investigation, I know that a "boat" is a slang term for
1,000 pills, and a "blue" refers to blue-colored M30 fentanyl
pills.

outside of the same Bell Gardens residence where the September 2021 gun deal took place.

15.  On October 20, 2023, at approximately 1:00 p.m., BUJASE walked down the driveway toward UC-1's car.  BUJASE was carrying a multicolored bag.  BUJASE and UC-1 had a conversation through the car window, and BUJASE handed UC-1 the multicolored bag he was seen carrying toward the car.  UC-1 paid BUJASE $600. The bag BUJASE sold to UC-1 on October 20, 2023, was ultimately found to contain approximately 1,015 pills.  It appeared as follows:



16. A Drug Enforcement Administration ("DEA") laboratory later tested a sample of the pills BUJASE sold on October 20, 2023, and confirmed that they contained fentanyl.

17.  Between October 28, 2023, and October 31, 2023, via Instagram, BUJASE repeatedly offered "boats" for sale,[4] naming specific prices per pill, and arranging to meet with the CI and another person the CI introduced as a customer but who was

---

[4] As noted above, a "boat" typically refers to 1,000 pills.

actually another undercover ATF agent ("UC-2").  BUJASE told the
CI to meet him on October 31, 2023, at the same Bell Gardens
location where the previous transactions had taken place.  On
October 31, 2023, at about 12:43 p.m., BUJASE walked toward
UC-2's car, got into the front passenger seat, and introduced
himself.  BUJASE then handed UC-2 a bag containing five clear
plastic bags with pills inside.  UC-2 paid BUJASE $3,250.
BUJASE also discussed the difficulties of getting the pills from
Mexico, and how he finds it necessary to find people in the
United States who make the pills.  The bag BUJASE sold to UC-2
on October 31, 2023, was ultimately found to contain
approximately 5,050 pills and appeared as follows:



18.  A DEA laboratory tested a sample of the pills BUJASE
sold on October 31, 2023, and confirmed that they contained
fentanyl.

19.  On November 4, 2023, BUJASE offered to sell more
fentanyl, writing, "More shipment gets here in a couple days"
and "do I reserve any"?  Over the following days, BUJASE, the
CI, and UC-2 communicated about the transaction, and BUJASE

indicated that the transaction would take place on November 20, 2023, near a residence in South Los Angeles, within the Central District of California, a place that BUJASE later indicated was "[his] girls house."  On that date, BUJASE walked toward UC-2's car, which was parked outside of the residence, with a backpack and got into UC-2's car.  Once inside, BUJASE opened the backpack, took out a multicolored bag, and handed the bag to UC-2.  UC-2 paid BUJASE $3,750.  UC-2 saw that the multicolored bag contained five clear plastic bags with pills inside.  The bag BUJASE sold to UC-2 on November 20, 2023, was ultimately found to contain approximately 5,228 pills.  It appeared as follows:



20.  A DEA laboratory tested a sample of the pills BUJASE sold on November 20, 2023, and confirmed that they contained fentanyl.

21.  Between December 15, 2023, and December 19, 2023, BUJASE offered more drugs for sale.  BUJASE sent the CI a text

message containing the following image, which I believe depicts bags of blue M30 fentanyl pills:



22. Over the following days, BUJASE and the CI communicated about fentanyl pills that BUJASE would sell to UC-2. BUJASE arranged for the transaction to take place on December 19, 2023, at the same location as the November 20, 2023 transaction. At about 11:24 a.m. on December 19, 2023, BUJASE got into the front passenger seat of UC-2's car, which was parked outside of the residence, and handed UC-2 a plastic bag containing five smaller bags with pills inside. UC-2 paid BUJASE $7,500. BUJASE indicated to UC-2 that he had five additional bags of pills inside of another car, and BUJASE retrieved the other bag and brought it into UC-2's car. The other bag also contained five clear bags with pills inside. In all, the bags that BUJASE sold to UC-2 on December 19, 2023, were ultimately found to contain approximately 9,985 pills and appeared as follows:



23.   The DEA laboratory tested a sample of the pills BUJASE sold on December 19, 2023, and confirmed that they contained fentanyl.

24.   Between December 30, 2023, and February 13, 2024, BUJASE communicated with the CI about selling more drugs.  For example, on February 3, 2024, BUJASE wrote, "work in," which I interpret to mean, based on my training, experience, and involvement in this case, that BUJASE had received a new shipment of drugs available for sale.  On February 8, 2024, BUJASE followed up with the CI, asking, "Any play"?

//

//

//

25.  On February 12, 2024, the CI indicated to BUJASE that UC-2 was interested in buying 10,000 fentanyl pills, and BUJASE then ultimately arranged for the transaction to take place on February 21, 2024, near a barber shop in South Central, Los Angeles, within the Central District of California.  At about 8:48 p.m. on February 21, 2024, BUJASE met with the UC-2 and got into UC-2's car holding a plastic bag.  UC-2 paid BUJASE $7,700.  UC-2 saw that the bag contained two vacuum sealed packages with pills inside.  The bags were ultimately found to contain approximately 10,133 pills and appeared as follows:



26.  The DEA laboratory tested a sample of the pills BUJASE sold February 21, 2024, and confirmed that they contained fentanyl.

//

//

//

27.  On April 17, 2024, BUJASE sold more fentanyl pills to UC-2, who were both present for the transaction.  The transaction took place near the same barber shop in South Central, Los Angeles, where the February 21, 2024, transaction took place.  There, BUJASE indicated for UC-2 to get into someone else's car.  There were multiple passengers in the car, including a man carrying a monkey.  During the meeting, one of the car passengers indicated he was BUJASE's supplier, and that he also traffics firearms from Arizona to California.  While they were in the car, BUJASE handed UC-2 pills inside of vacuum-sealed packaging.  UC-2 paid BUJASE $7,300.  The item BUJASE sold was ultimately found to contain approximately 10,074 pills and appeared as follows:



28.  The DEA laboratory tested a sample of the pills BUJASE sold and confirmed that they contained fentanyl.

29.  On September 13, 2024, BUJASE placed a phone call to UC-2.  During this recorded phone call, UC-2 asked if BUJASE's source had obtained any firearms, BUJASE informed UC-2 that

there were previously firearms available, however BUJASE did not
contact UC-2 due to him/her being out of town.

### V. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

30. From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own and deal firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

b.   Those who illegally possess firearms often sell
their firearms and purchase firearms from those who know they
are prohibited persons.  Many people also keep mementos of their
firearms, including digital photographs or recordings of
themselves possessing or using firearms on their digital
devices, or of firearms that they wish to sell to others.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

c.   Correspondence between persons buying and selling
firearms, including correspondence between co-conspirators in

the dealing of firearms without a license, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

31.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. <u>CONCLUSION</u>

32. For all of the reasons described above, there is probable cause to believe that BUJASE has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute and Distribution of Fentanyl).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __9th__ day of
October, 2024.

_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE